Filed 7/18/19

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| THE PEOPLE, | B286201 |
| --- | --- |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BA459662 |
| v. | |
| SHEILA COOPER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed.

Darden Law Group and Christopher Darden for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie C. Brenan and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant and appellant Sheila Cooper of driving under the influence of alcohol causing injury within 10 years of a prior driving under the influence offense. On appeal, Cooper contends the trial court erred in denying her motion to suppress statements she made to police during field sobriety tests administered at the police station. Cooper claims a violation of her Fifth Amendment rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We find no error and affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**1.** ***Cooper slams into the victims' car***

Just after 8:30 p.m. one January night in 2017, Yessenia Rosales was driving her Kia Forte on Manchester Boulevard in Los Angeles. In the passenger seat was her fiancé, Edmundo Mendez. Both Rosales and Mendez were wearing seat belts. Rosales was stopped at a red light. Just as the light turned green, Rosales and Mendez saw in their rearview mirror the lights of a car coming up behind them, closer and closer. The lights in the rearview mirror were getting brighter and more intense. The oncoming car hit the Kia very, very hard. Rosales's car went flying forward at least 50 feet and ended up on the other side of the intersection.

Mendez called 911. The operator told him just to get the information from the other driver. Mendez walked over to the car that hit him, a Chevrolet Camaro. Cooper was sitting in the driver's seat. Mendez spoke to her. At first she was "unresponsive" but after a few seconds she seemed to "c[o]me to." Cooper told Mendez he had no authority to ask for her identification because he was not a police officer. Cooper's speech was slurred and Mendez smelled alcohol on her breath.

A tow truck happened to drive by and stopped to help. Cooper got out of her car, approached the tow truck driver,

2

and said, "I need to get out of here.  Can you get me out of here?"  Mendez noticed Cooper was "wobbling," "swaying side to side" "like she couldn't walk straight."  Mendez called 911 again.

Donyell Journagin also was driving down Manchester that night.  While sitting at the red light, Journagin saw the lights of a car coming fast.  He estimated the car was traveling at least 65 or 70 miles per hour; the speed limit there is 35.  The car "just smack[ed]" into another car, "hit[ting] it hard" and knocking it "a good 70, 80 feet" across the intersection.  Journagin pulled over and got out to make sure everyone was alright, "[b]ecause the crash . . . was like a hard hit."

Journagin saw Cooper, who was "kind of stumbling" and kind of disoriented.  Journagin asked Cooper if she was okay and told her "[t]he people [were] going to need [her] I.D. to exchange the information."  Cooper started "acting crazy."  As Mendez walked up, Cooper "turned around" and "start[ed] saying like, what the fuck?  You motherfuckers work for Trump or something like that."  Journagin backed up; he and Mendez walked to the curb and Journagin told Mendez he'd have to wait for the police because "[y]ou can't take her I.D. or anything."

Los Angeles Police Department Officers Samual Colwart and Nathan Grate arrived at the scene about 10 minutes after the collision.  Cooper was standing on the sidewalk.  Colwart asked Cooper for her driver's license, registration, and proof of insurance.  Colwart noticed Cooper's eyes were red and watery, she smelled like alcohol, and she was chewing gum.  Her speech was slurred.  Cooper walked back to her car.  She was stumbling and unable to walk straight.

Cooper got into her car and "kind of just sat there."  She was upset and crying.  Eventually Cooper went through her wallet and handed her license to Colwart.  She got out of her car.  Colwart again asked Cooper for her registration and proof of

insurance. Cooper "became very upset" and "threw her wallet on the hood of the car." She was "walking around" and "cursing."

Colwart asked Cooper if she had been drinking; she said no. Colwart asked Cooper if she had "any physical defects"; she said no. Colwart asked Cooper where she had been going; she refused to answer. In response to Colwart's questions, Cooper told him what she had eaten and when she had last slept. Colwart asked Cooper if she was under a doctor's care and she responded, "Ain't your business."

Rosales saw that, while Cooper was talking with the officers, "[s]he was throwing her hands up" "then down in a slumping over motion," "walking back and forth," and "walking away from [the] officers."

## 2. *Officers take Cooper to the police station and ask her to perform field sobriety tests*

Colwart decided to take Cooper to the 77th Street police station to administer the field sobriety tests (FSTs). Colwart later explained: "[S]he was just so upset at the scene, she wasn't focused on any—the questions I was asking. She just was really upset. She wasn't . . . with the investigation at the time . . . . It would be unsafe." Cooper was "pacing around" and the roadway "was still an active collision scene." Female officers arrived. They had to "grab [Cooper] and bring her to the [police] car." The station was one and one-half to two miles from the scene.

Once at the station, Colwart began the FSTs with Cooper in the long hallway next to the watch commander's room. Cooper was not handcuffed. Colwart did not see any "physical defects," physical problems, or medical issues that might prevent Cooper from performing the FSTs. According to Colwart, there are "preset instructions" for the FSTs—officers give the tests in a particular order. Colwart typically explains each test in turn,

asks the suspect if she understands the test, and then asks the suspect to perform the test.

The first test was the "eye examination," looking for horizontal gaze nystagmus. Cooper's performance was "consistent with somebody who is impaired due to alcohol."

Next, Colwart had Cooper perform the modified Romberg test.[1] Colwart instructed Cooper to stand with her feet together, hands to her sides, close her eyes, tilt her head back, and estimate 30 seconds. Colwart demonstrated. Cooper swayed back and forth slightly while performing the test; she estimated 23 seconds to be 30 seconds. Variation within the "normal range" is five seconds in either direction; Cooper's estimate of 23 seconds thus was just outside the normal range. Her performance on that test—without more—would not demonstrate impairment.

Next, Colwart explained, then demonstrated, the walk-and-turn test. Cooper indicated she understood the test but she refused to perform it. Cooper told Colwart "her thighs were too big and her pants were too tight." Colwart then explained and demonstrated the one-leg stand test. Cooper refused to do that test as well. She told Colwart "she wouldn't be able to do it because she had a disability." Cooper told Colwart the nature of the disability "ain't [your] business."

Colwart read Cooper the chemical admonition, advising her she was required to submit to a breath test or a blood test.[2]

---

[1] Colwart testified the Romberg test is not a standardized FST recognized by the National Highway Traffic Safety Administration. The LAPD uses the test anyway.

[2] Under California's Implied Consent Law, "[a] person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood or breath for the purpose of determining the alcohol content of his or her blood, if lawfully

Cooper chose the breath test.  Colwart's partner Grate administered the EC/IR intoxilyzer breath test.  Grate first observed Cooper for 15 minutes.  Grate then explained to Cooper how to do the test.  Cooper purported to blow into the machine but she didn't blow hard enough and the machine "said insufficient sample."  Grate asked Cooper three more times to blow into the machine properly and with sufficient force, without success.  At one point, Cooper wrapped her lips too tightly around the mouthpiece so her breath was "block[ed]" from "go[ing] into the EC/IR machine to provide a sample."

Colwart summoned the watch commander, Sergeant Deanna Quesada, from her office.  Quesada explained to Cooper "that she's required by the state to submit to a chemical test to determine the alcohol content of your blood."  Quesada told Cooper she could have a breath test or a blood test.  Quesada advised Cooper of the consequences of refusing to submit to a test.  According to Quesada, Cooper did not respond; she was just silent.  Colwart recalled Cooper did respond; he could not remember her exact words, but she "essentially refuse[d] to take any more tests."

### 3. *The victims' injuries*

The victims' Kia was totaled.  At the time of trial, about nine months after the collision, Rosales still had headaches every day.  She suffered from knee pain, shoulder pain where her seatbelt had crossed her shoulder, and insomnia, even though she was taking muscle relaxants.  The shoulder pain was "constant": "[i]t really hurts . . . all the time now."  Rosales was unable to perform some of her job duties as a nanny.

---

arrested for [a driving under the influence] offense . . . ." (Veh. Code, § 23612, subd. (a)(1)(A).)

6

Mendez suffered from back pain caused by discs that were "protruding a few centimeters out of place." He also had muscle weakness in his hip and went to physical therapy for five months. He was not able to perform all of his duties as a security officer.

4.    ***The charges,*** **Miranda** *hearing, trial, verdicts, and sentence*

The People charged Cooper with driving under the influence of alcohol (DUI) within 10 years of a prior felony DUI conviction (count 1), and DUI causing injury within 10 years of another DUI offense (count 2). The People alleged Cooper had refused to submit to the mandatory chemical test, and she had suffered a prior strike conviction for criminal threats.

Before trial, Cooper filed a *Miranda* motion. Cooper "object[ed] to the admission in [the] trial of any and all evidence related to admissions of the Defendant made prior to being advised of her *Miranda* rights, after she was detained (handcuffed and placed in a patrol vehicle)." Before the trial began, the court conducted an evidentiary hearing. Officer Colwart testified Cooper almost certainly was handcuffed while being transported to the station in the police car. Officers removed the cuffs at the station before Cooper began the FSTs.

Colwart described each test he demonstrated for Cooper. He testified she did not perform the walk-and-turn test; she said "her thighs [were] too big" and her "jeans [were] too tight." Colwart testified after he explained the one-leg stand test and asked Cooper to perform it, she said, "I won't be able to due to disability." The court asked, "So you've done the one test, now you're moving to the next test . . . and you're explaining that test to her? . . . And then at some point she makes certain statements to you about why she can't perform that test?" Colwart answered, "Yes. . . . That's the way it happened."

7

On cross-examination, Colwart testified he had not yet arrested Cooper, nor even formed an opinion that she was under the influence or impaired, when he had her transported to the station. It was still a pending investigation at that juncture.

Cooper's counsel argued Cooper was in custody once she was put in the police car and taken to the station. The court asked, "[Y]ou're not contesting that they had the right to administer these tests, are you?" Counsel responded, "They are voluntar[y] test[s]." The court said, "But what interrogation was going on there? This was an administration of tests." The court continued, "Your issue is . . . there is no way that the police can transport someone to the station and give them sobriety tests unless they give them a *Miranda* warning and the person consents to the test[s]; that's your position?" Counsel answered, "Yes." The court asked, "You want me to suppress all oral statements she made from the time she got out of the car and was asked to do the field sobriety tests; is that what your position is?" Counsel said, "Yes." The court denied the motion.

In October 2017, a jury convicted Cooper of both counts and found the refusal allegation true. Cooper waived jury on, and later admitted, her prior convictions. The trial court denied Cooper's *Romero* motion.[3] The court earlier had said it might well grant the motion, as Cooper's strike was more than 13 years old. But after reading the probation department report, the court stated it was "astonished" at Cooper's record. The court recounted Cooper's numerous DUI convictions.[4] The court said,

---

[3]     *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

[4]     According to the probation department, Cooper pled to reckless driving in August 2002 in a case initially filed as a DUI. Less than a month later, she again was charged with a DUI. Less than two months later, Cooper was arrested again for DUI,

"I just was astonished at the record and dismayed by the number of convictions. I feel she has a serious problem with alcohol and with driving under the influence, and I would consider her to be a serious danger to those in the community." The court sentenced Cooper to six years in the state prison, calculated as the upper term of three years doubled because of Cooper's strike. The court also ordered Cooper to serve four additional days in custody for refusing to submit to a chemical test.

## DISCUSSION

Cooper argues the trial court erred in declining to suppress six statements she made at the police station:

- "That her thighs were to[o] big [to] perform a field sobriety test";
- "That her jeans were too tight to perform a field sobriety test";
- "That she could not perform a field sobriety test because she suffered a disability";
- "That when asked the nature of her disability she stated, 'Ain't none of your business' ";
- " 'I don't want to take any more tests' "; and

---

convicted, and ordered to complete an 18-month alcohol education program. Less than six months later, Cooper was arrested and charged with DUI as well as criminal threats, battery on a peace officer, and gassing. In November 2004, she was arrested for driving with a suspended license. In October 2006, Cooper again committed a DUI. In July 2007 she committed a hit-and-run; she also was charged with driving while her license was suspended for failure to comply with DUI conditions. In July 2009, Cooper was charged with felony DUI causing injury and hit-and-run with injury committed in November 2007. Cooper also was convicted of theft and drug crimes between 1989 and 2008.

- "Her response to the modified Romberg test, when she stated 23 seconds had passed when in fact only 30 seconds had lapsed [*sic*]."

The People argue "[t]he trial court properly found these statements admissible because [Cooper] was not being interrogated when she made the statements."[5]

In California, federal constitutional standards govern the admissibility of statements made during a custodial interrogation. (*People v. Nelson* (2012) 53 Cal.4th 367, 374; *People v. Cunningham* (2001) 25 Cal.4th 926, 993.) "In reviewing the trial court's denial of a suppression motion on *Miranda-Edwards*[6] grounds, 'it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 385; see also *Cunningham*, at p. 992.)

The Fifth Amendment does not bar the admission of "[v]olunteered statements of any kind" (*Miranda, supra*, 384 U.S. at p. 478), nor those otherwise not resulting from interrogation. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 299-300.) Nontestimonial responses by a suspect—even though made in the course of custodial interrogation—are not subject to the *Miranda* rule. (*Pennsylvania v. Muniz* (1990) 496 U.S. 582 (*Muniz*).) The United States Supreme Court has drawn

---

5       The People do not dispute Cooper was in custody for *Miranda* purposes once she was handcuffed and taken to the police station.

6       *Edwards v. Arizona* (1981) 451 U.S. 477.

"a distinction between 'testimonial' and 'real or physical evidence' for purposes of the privilege against self-incrimination." (*Id.* at p. 591.) Thus, a suspect may be compelled to provide a blood sample (*Schmerber v. California* (1966) 384 U.S. 757); participate in a lineup and repeat a phrase provided by police (*United States v. Wade* (1967) 388 U.S. 218); provide a handwriting exemplar (*Gilbert v. California* (1967) 388 U.S. 263); and read a transcript to provide a voice exemplar (*United States v. Dionisio* (1973) 410 U.S. 1).

In *Muniz*, police found Muniz parked on the shoulder of a highway. He appeared to be under the influence. The officer asked Muniz to perform three FSTs: the horizontal gaze nystagmus test, the walk-and-turn test, and the one-leg stand test. (*Muniz*, *supra*, 496 U.S. at p. 585.) Muniz performed poorly. The officer arrested Muniz and took him to the station, where he asked him to repeat the tests. Muniz " 'often requested further clarification of the tasks he was to perform' " and " 'attempted to explain his difficulties in performing the various tasks.' " (*Id.* at pp. 585-586.)

The officer also asked Muniz several questions, such as his address, height, weight, and so forth. One of those questions required Muniz to give the date of his sixth birthday. Muniz was unable to do so. (*Muniz*, *supra*, 496 U.S. at p. 586.)

The Court held requiring a suspect to perform FSTs does not violate the Fifth Amendment "because the evidence procured is of a physical nature rather than testimonial." The officer's "dialogue with Muniz concerning the physical sobriety tests consisted primarily of carefully scripted instructions as to how the tests were to be performed. These instructions were not likely to be perceived as calling for any verbal responses and therefore were not 'words or actions' constituting custodial interrogation . . . . The dialogue also contained limited and

11

carefully worded inquiries as to whether Muniz understood those instructions, but these focused inquiries were necessarily 'attendant to' the police procedure held by the court to be legitimate.  Hence, Muniz's incriminating utterances during this phase of the . . . proceedings were 'voluntary' in the sense that they were not elicited in response to custodial interrogation." (*Muniz*, *supra*, 496 U.S. at pp. 602-604.)

The officer's request that Muniz calculate the date of his sixth birthday was different, however.  Because that question required Muniz "to communicate an express or implied assertion of fact or belief," Muniz's inability to answer the question was testimonial.  (*Muniz*, *supra*, 496 U.S. at pp. 592, 597.)

*Muniz* forecloses Cooper's argument as to the first four of the six statements she lists in her brief.  Asking a DUI suspect to perform physical tests is not an "interrogation."  Colwart testified he explained each test, demonstrated several of them, asked Cooper if she understood, then asked her to perform the tests.  Cooper volunteered her statements, claiming an inability to perform the tests and telling Colwart the nature of the "disability" she cited was none of his business.  It is plain why the legal analysis Cooper proposes is not the law:  A driver suspected of being under the influence could simply behave obstreperously at the scene, requiring officers to take her to the station for everyone's safety to perform the FSTs.  The suspect then could claim—because she was now "in custody"—her *Miranda* rights attached and she had a Fifth Amendment right to refuse to perform the tests.  Where—as here—officers did not yet have probable cause to arrest the suspect, but instead were

trying to continue their investigation, they would have no choice but to release the suspect.[7]

Cooper's argument as to the fifth listed statement—that she didn't want to take any more tests—similarly fails.[8] A police inquiry to a suspect as to whether she will submit to a chemical test is not an "interrogation" within the meaning of *Miranda*. (*South Dakota v. Neville* (1983) 459 U.S. 553, 564; *Muniz, supra*, 496 U.S. at pp. 604-605 [officer read suspect script explaining how breathalyzer examination worked, nature of state's implied consent law, and consequences of refusal; officer's questions whether suspect understood instructions and wished to submit to test did not constitute interrogation under *Miranda*].)

Cooper's sixth challenged statement—her estimate of 23 seconds on the modified Romberg test when in fact 30 seconds had elapsed—requires a different analysis. Cooper relies on *People v. Bejasa* (2012) 205 Cal.App.4th 26 (*Bejasa*). There, officers arrived at the scene of an auto accident and found Bejasa, who had methamphetamine and syringes. He also was on parole. An officer handcuffed Bejasa, told him he was being detained for a possible parole violation, and put him in the police car. After other officers arrived, Bejasa was let out of the car and uncuffed. He was "interview[ed]," asked to do FSTs (including the Romberg test), and then arrested. (*Id*. at pp. 30-31.)

---

[7] Officer Colwart testified he did not arrest every suspect who was detained and asked to perform FSTs. If—as a result of the FSTs—Colwart determined the suspect was not under the influence, Colwart would let that person go.

[8] As noted, Sergeant Quesada's recollection was Cooper never made this statement. Officer Colwart testified Cooper said something to that effect, but he could not recall her exact words.

The appellate court concluded Bejasa's "incriminating statements regarding his use of drugs" made during questioning, as well as his performance on the Romberg test, should have been suppressed. The court noted officers already had probable cause to arrest Bejasa on a parole violation. (*Bejasa*, *supra*, 205 Cal.App.4th at pp. 33, 39-45.) The officer's questioning went beyond general on-the-scene questioning; by the time the officer "contacted [Bejasa], [he] had moved past interrogation and into the realm of inculpation." (*Id*. at p. 40.) Moreover, Bejasa's statement during the Romberg test was like Muniz's response to the question about the date of his sixth birthday: it required the suspect to make a calculation and "to communicate an implied assertion of fact or belief." (*Id*. at p. 43.)

Here, Officer Colwart testified he did not have probable cause to arrest Cooper before he administered the FSTs. His investigation was ongoing. In any event, any error by the trial court in denying Cooper's motion to suppress her estimate of 23 seconds on the Romberg test was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.) Cooper's performance on the horizontal gaze nystagmus test showed impairment, she refused to do two other FSTs, she was swaying and unsteady on her feet on the roadway, and she smelled of alcohol. Colwart admitted Cooper's "slight" deviation from normal on the Romberg test was not enough to constitute probable cause for a DUI arrest.

## DISPOSITION

We affirm Sheila Cooper's conviction.

## CERTIFIED FOR PUBLICATION

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.