Filed 5/29/24  P. v. Bennett CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JACOB ALAN BENNETT, <br><br> Defendant and Appellant. | D082597 <br><br><br> (Super. Ct. No. SCE408913) |


APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed.

Jacob Alan Bennett, in pro. per.; and Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

# I

# INTRODUCTION

A jury found Jacob Alan Bennett guilty of one count of rape of an unconscious spouse (former Pen. Code, § 262, subd. (a)(3); count 1)[1] and one count of oral copulation with an unconscious person (§ 287, subd. (f); count 2). The trial court sentenced Bennett to an aggregate term of three years in prison, consisting of the low term of three years for the oral copulation conviction and a concurrent low term of three years for the rape conviction.

Bennett's appointed appellate counsel has filed an opening brief asking our court to conduct an independent review of the record pursuant to *Anders v. California* (1967) 386 U.S. 738 (*Anders*) and *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*). We granted Bennett the opportunity to file a supplemental brief on his own behalf and he has done so.

After reviewing the briefing submitted by Bennett and his appointed appellate counsel, we affirm the judgment of conviction.

# II

# BACKGROUND

Bennett and C.B. met in 2016 and got married in 2017. C.B. had two children of her own, and Bennett and C.B. had one child together. The marriage was plagued by fighting, domestic violence, and infidelity. Bennett and C.B. lived together until the summer of 2019, at which point C.B. moved into a separate apartment with the children. C.B. filed for a divorce from Bennett near the end of 2020.

A. *Prosecution Evidence*

In January 2020, C.B. caught Bennett cheating on her. She packed a bag, arranged for a friend to pick her up, and tried to leave her apartment,

---

[1] Further undesignated statutory references are to the Penal Code.

but Bennett slammed her onto the bed and choked her in the presence of the children. Neighbors heard C.B. screaming at Bennett to stop, so they called the police. The police arrived and questioned C.B. while Bennett was present. C.B. was not forthcoming about the incident and the police took no further action.

A few weeks later, C.B. told Bennett she did not want to be with him anymore. In response, Bennett angrily broke a fan and swiped food off a table in C.B.'s apartment. C.B. called the police, which angered Bennett further and caused him to grab her, pick her up, and throw her around. After he threw her a few times, she slapped him across the face. When the police arrived, they arrested C.B. for slapping Bennett. However, no charges were filed against her in relation to the slapping incident. After this altercation, Bennett and C.B. remained married and coparented together, but they separated from one another.

One night in April 2020, C.B. and Bennett put the children to bed, consumed marijuana, and struck up a conversation in C.B.'s living room. While C.B. was talking, Bennett interrupted her and asked her to orally copulate him. She refused. Twice more during the conversation, he made sexual advances and she refused. Later on, Bennett fell asleep in his chair and C.B. fell asleep on the couch. C.B. was wearing a shirt, pajama pants, underwear, and a bra.

When C.B. awoke shortly after midnight, her pants and underwear were pulled down and Bennett was on top of her with his penis inside of her vagina. C.B. kept her eyes closed and did not say or do anything. After a few minutes, Bennett ejaculated inside her. He then went into the bathroom, shut the door, and flushed the toilet. While he was in the bathroom, C.B. opened her eyes and saw three or four sex toys lying on the couch and the

3

floor. She was unsure whether the sex toys had been used on her while she was asleep. When Bennett returned to the living room, C.B. closed her eyes again. Bennett wiped his ejaculate off her with toilet paper, put away the sex toys, and went to bed. Meanwhile, C.B. stayed on the sofa, cried, and finished cleaning "the mess" off her. According to C.B., she "hurt" and felt "bad" and "uncomfortable down there."

The next day, C.B. called her friend and told her what had happened to her the prior night. During the call, Bennett came into the room and asked C.B. whether they were "good." She said, "no, we're not fucking good," and she told him she knew everything he had done. Bennett admitted everything, cried, apologized, and said he had "problems."

Over the next several weeks, C.B. did not report the sexual assault to police, but she disclosed it to friends and her mother. Bennett also sent C.B. text messages and social media messages apologizing to her, claiming he was fighting "demons," and stating he would go to counseling In response, she called him a rapist and told him to stop harassing her.

By May 2020, C.B. was in a romantic relationship with another man. One evening, Bennett dropped the children at C.B.'s apartment and put them to bed while C.B. and her new partner were away. The next morning, C.B. heard a pounding at her front door. She opened the door and Bennett forced his way into the apartment. Bennett showed C.B. that he had secretly placed a surveillance camera under her bed and, according to C.B., he had recorded her "doing exactly what you all could imagine" with her new partner. C.B. tried to prevent Bennett from going into the bedroom to fight her new partner. Bennett shoved C.B. to the ground, picked her up, and threw her several times. Ultimately, C.B.'s new partner left the apartment and drove away without physically confronting Bennett. C.B. went to a friend's house

4

and took photographs of her injuries, but she did not report the incident to police.

About a month later, Bennett filed and served C.B. with a restraining order. This prompted C.B. to disclose the rape to the sheriff's department and file her own request for a restraining order against Bennett. Ultimately, Bennett and C.B. agreed to drop their requests for restraining orders.

During the ensuing investigation into the rape, Bennett voluntarily consented to a search of his cell phone. From the search of the phone, police discovered that Bennett sent a text message to someone a few days after the rape, which read, "No matter how hard I fought. I couldn't stop. I tried. My body wouldn't stop." The day after that, he sent a message on social media to his father that read, "[C.B.] is gone. She left. She's very hurt and needs time. Okay. I just – I can't just up and leave. I would literally go to jail." About two months after the rape, C.B. sent a text message to Bennett that said, "You raped me." Bennett did not deny the accusation and instead apologized to her.

Bennett also consented to a videotaped interview with members of the sheriff's department. During the interview, Bennett stated:

> "That night we were having a good time, uh, she didn't want to, *she said no, we fell asleep. A couple hours later went by, I was like, went down on her. She didn't wake up.* I went to the bathroom, took care of things, go back to bed. Woke up the next morning, everything was fine. She disappeared for a couple of hours, come back and accused me of raping her. Uh, I come to find out a little later she actually went to go see her uh, friend and he's gonna try to sleep with her – which I knew that – and he convinced her that I'd been raping her, and any time that that happened, I raped her." (Italics added.)

Bennett said he did not sexually penetrate C.B. or ejaculate inside her because "she didn't wake up." Instead, he just "went down on her" for "a couple of minutes." When asked by the interviewing detective what kind of

penetration occurred when he "went down" on her, Bennett replied, "Uh, my mouth."

B. *Defense Evidence*

C.B.'s stepfather testified that he and C.B. never got along and he had described her to law enforcement as a "perfect liar" and a "professional manipulator." He testified she once threatened to make a false police report against him for child molestation if he did not help her move into her new apartment. He believed she could make up false police reports.

Bennett testified in his own defense. With regard to the night of the alleged rape, Bennett testified he and C.B. were at the apartment discussing intimacy and their plans for the future. At one point during the conversation, at about 11:00 p.m. or midnight, he asked her to orally copulate him. She laughed and said no. Bennett fell asleep between midnight and 1:00 a.m. while he was seated in a chair. He awoke to find C.B. laying on the couch. He kissed her on the cheek and down her body until he reached her thigh. However, he realized she was not awake, so he stopped, went to the bathroom, masturbated, and returned to sleep next to C.B. on the couch. According to Bennett, when he told the detective he "went down" on C.B., he meant he kissed down her body with the intent to engage in oral sex, but did not actually engage in oral sex with her. Bennett denied raping C.B. or orally copulating her while she slept.

C. *Procedural Background*

Bennett appealed the judgment and our court appointed appellate counsel to represent him in the appeal. Counsel filed a *Wende* brief that summarized the facts of the case and asked our court to review the record for error. He did not identify any arguable issues for reversal of the judgment. However, to assist our court in its review of the record, and in compliance

6

with *Anders, supra*, 386 U.S. 738, counsel listed the following possible issues that were considered in evaluating the potential merits of the appeal: (1) whether the evidence satisfied the corpus delicti rule, (2) whether the trial court violated Bennett's due process rights by taking judicial notice of the dictionary definition of the phrase, "going down on someone," and (3) whether the trial court properly excluded evidence that Bennett and C.B. previously consented to oral copulation of one another while they were asleep.

Additionally, we offered Bennett the opportunity to file his own supplemental brief on appeal, and he has done so.

III

DISCUSSION

As best we can discern, Bennett makes five arguments in support of reversal of the judgment: (1) the evidence from the preliminary hearing was insufficient to hold him to answer; (2) the trial court erroneously denied his motion to set aside count 2 of the information; (3) the evidence did not satisfy the corpus delicti rule for count 2; (4) a jury note to the court shows the jury harbored a reasonable doubt as to his guilt; and (5) the court's admission of his extrajudicial statements into evidence violated his right against self-incrimination. We address each of these arguments in turn.

A. *The Evidence was Sufficient to Hold Bennett to Answer*

Bennett launches a variety of attacks on the evidence from the preliminary hearing with the apparent goal of challenging the sufficiency of the evidence supporting the magistrate's finding of probable cause. In particular, he speculates C.B. could have fabricated the messages that were sent to her from his phone and his social media account. He also notes that C.B. admittedly never saw his penis inside her vagina and she testified she went into a dissociative state during the sexual assault. These arguments—

7

all of which go the weight of the evidence and C.B.'s credibility—do not cast doubt on the sufficiency of the preliminary hearing evidence.

The purpose of a preliminary hearing is "to establish whether there exists probable cause to believe that the defendant has committed a felony." (§ 866, subd. (b).) "Probable cause exists if a person ' " ' "of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion" ' " ' that the defendant committed the crime." (*Galindo v. Superior Court* (2010) 50 Cal.4th 1, 8.) " ' "An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." ' " (*Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 544.) "Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." (*People v. Superior Court (Lujan)* (1999) 73 Cal.App.4th 1123, 1127 (*Lujan*).) " ' "[T]he showing required at a preliminary hearing is exceedingly low." ' " (*Zemek*, at p. 544; see *Lujan*, at p. 1127 ["The evidentiary showing required for a preliminary hearing is not substantial."].)

Drawing all reasonable inferences in favor of the information, we conclude the evidence adduced at the preliminary hearing was sufficient to hold Bennett to answer. At the preliminary hearing, C.B. provided a detailed account of the sexual assault. She testified that Bennett asked her for oral sex and propositioned her multiple times, she refused him each time, and she fell asleep. When she awoke, her underwear and pants were pulled down and she felt Bennett's penis inside her vagina. According to C.B., she felt him ejaculate inside her and she felt pain and discomfort in her vagina.

Additionally, the prosecution elicited testimony from the investigating detective at the preliminary hearing. He testified about C.B.'s reporting of the incident to law enforcement and Bennett's voluntary admissions about

8

the incident. In particular, he testified that Bennett voluntarily admitted he orally copulated C.B. while she was asleep. Moreover, the detective testified that the incriminating text messages and social media messages C.B. gave to law enforcement matched messages that law enforcement found on Bennett's phone, thus corroborating the authenticity of the messages. This evidence—considered together with C.B.'s preliminary hearing testimony—was sufficient to support the magistrate's finding of probable cause.

B. *The Trial Court Properly Denied the Motion to Set Aside Count 2*

In its initial complaint, the prosecution charged Bennett with a single count of rape of an unconscious spouse in violation of former section 262, subdivision (a)(3) (count 1). At the preliminary hearing, Bennett was held to answer on count 1. Subsequently, the prosecution filed an information adding a charge of oral copulation with an unconscious person in violation of section 287, subdivision (f) (count 2). Bennett thereafter moved to set aside count 2 under section 995, subdivision (a)(2), and the court denied the motion. On appeal, Bennett claims the court erred by denying his motion to set aside count 2. We disagree.

Section 995 provides, in pertinent part, that an information shall be set aside when the "defendant had been committed without reasonable or probable cause." (§ 995, subd. (a)(2)(B).) In effect, " 'section 995 allows a defendant to challenge an information based on the sufficiency of the record made before the magistrate at the preliminary hearing.' " (*Mendoza v. Superior Court* (2023) 91 Cal.App.5th 42, 54.)

Notwithstanding section 995, the prosecution has the power to file "an information against the defendant which may charge the defendant with either the offense or offenses named in the order of commitment *or any offense or offenses shown by the evidence taken before the magistrate to have*

9

*been committed.*" (§ 739, italics added.)  "Once a magistrate has issued a commitment order, under section 739 the prosecution may charge in an information 'a different but related crime shown by the evidence taken before the magistrate.' [Citation.]  The crime is related if it arose out of the transaction that was the basis for the magistrate's holding order." (*People v. Superior Court* (*Fernandez*) (2023) 88 Cal.App.5th 26, 31; see also *People v. Graff* (2009) 170 Cal.App.4th 345, 360 ["The statutes governing criminal proceedings ... permit the prosecution to file an information against the defendant containing charges not contained in the order of commitment."].)

The trial court properly denied Bennett's set-aside motion because count 2 was closely related to count 1 and there was sufficient evidence at the preliminary hearing to support a finding of probable cause for count 2.  Most notably, Bennett admitted that after C.B. fell asleep, he "went down" on her and she "didn't wake up."  In addition to this damning admission, there was substantial circumstantial evidence to support the oral copulation charge.  As noted, C.B. testified at the preliminary hearing that Bennett asked her for oral sex before she fell asleep and, when she awoke, he was on top of her and her underwear and pants were pulled down.  She also testified she felt pain and discomfort in her vagina.  Collectively, this circumstantial evidence and Bennett's confession were sufficient to support the oral copulation charge and warrant the denial of Bennett's set-aside motion.

C. *There was no Violation of the Corpus Delicti Rule*

In a related argument, Bennett claims his conviction for count 2 must be overturned because there was insufficient evidence—apart from his out-of-court admissions—to satisfy the corpus delicti rule.  "This rule, which 'has [its] roots in the common law' [citation], precludes 'convictions for criminal conduct not proven except by the uncorroborated extrajudicial statements of

10

the accused. [Citations.] [It] is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened.' [Citation.] ' "The amount of independent proof of a crime required [to satisfy the corpus delicti rule] is quite small." [Citation.] The prosecution need not adduce "independent evidence of every physical act constituting an element of an offense." [Citation.] Instead, it need only make "some indication that the charged crime actually happened," so as to ensure "that the accused is not admitting to a crime that never occurred." ' [Citation.] 'The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible.' " (*People v. Gonzalez* (2021) 12 Cal.5th 367, 381–382 (*Gonzalez*).)

"Given the low quantum of proof that is required, we are satisfied that the prosecution provided the ' "minimal" ' amount of independent evidence necessary to satisfy the corpus delicti rule." (*Gonzalez, supra*, 12 Cal.5th at p. 382.) As noted, the prosecution elicited testimony from C.B.—both at the preliminary hearing and at trial—that Bennett asked her for oral sex shortly before she fell asleep on the night in question. She testified her pants and underwear were pulled down when she awoke, Bennett was on top of her, and she then felt him ejaculate inside her vagina. Further, she testified she felt pain and discomfort in her vagina. This evidence certainly gave at least " 'some indication' " that Bennett orally copulated her while she slept, just as Bennett said he did. (*Gonzalez,* at p. 381; see *People v. Jones* (1998) 17 Cal.4th 279, 302 [no violation of corpus delicti rule in forcible oral copulation case because deceased victim was found without underwear or shoes and semen was found in her vagina and on her external genitalia and anus].)

11

Because there was independent evidence that the crime of oral copulation occurred, there was no violation of the corpus delicti rule.

D. *The Jury Note did Not Show that the Jury Harbored a Reasonable Doubt About Bennett's Guilt*

During its deliberations, the jury sent a note to the court that read, "If possible we would like to know if internet history was attained/investigated on the night of the alleged rape and can we access this? (From defendants [sic] phone)[.]" The court responded to the note as follows, "All evidence has been presented during the trial. Additional evidence is not available."

In his supplemental brief, Bennett contends the jury note "shows reasonable doubt that the alleged crime occurred," which precluded the jury from finding him guilty of the charged offenses. We reject this argument. The jury note does not in any way suggest the jury harbored a reasonable doubt concerning Bennett's guilt. It merely conveyed a precatory request for additional evidence on a discrete topic if such evidence was available.

Moreover, prior to deliberations, the court instructed the jury that the prosecution bore the burden of proof and Bennett was entitled to an acquittal unless the evidence proved he was guilty beyond a reasonable doubt. "We presume jurors understand and follow the instructions they are given." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 431.) Thus, even if the jury note showed that certain jurors were temporarily uncertain about Bennett's guilt *while deliberations were still ongoing*, the fact that the jury subsequently returned a guilty verdict for both offenses confirms that, *by the end of its deliberations*, the jury was convinced of Bennett's guilt beyond a reasonable doubt.

E. *The Admission of Bennett's Voluntary Out-of-Court Statements into Evidence did not Violate his Right Against Self-Incrimination*

Finally, Bennett claims the court's admission of his incriminating statements to the investigating detective violated his right against self-incrimination. This argument is unpersuasive. Bennett's statements to the detective were voluntary. Thus, their admission into evidence did not implicate or contravene Bennett's right against self-incrimination. (See *People v. Webb* (1993) 6 Cal.4th 494, 526 [no violation of defendant's right against self-incrimination where defendant's recorded statements were "completely voluntary and compulsion-free"]; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1195 [same]; accord *People v. Cooper* (2019) 37 Cal.App.5th 642, 650 ["The Fifth Amendment does not bar the admission of '[v]olunteered statements of any kind' "].)

F. *Summary*

We have reviewed the record for error as required by *Wende* and *Anders*. We have not discovered any arguable issues for reversal on appeal. Competent counsel has represented Bennett in this appeal.

IV

DISPOSITION

The judgment of conviction is affirmed.

McCONNELL, P. J.

WE CONCUR:

DO, J.

CASTILLO, J.

13