Filed 5/9/25  P. v. Chism CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIAM RAY CHISM II,<br><br>    Defendant and Appellant. | D083663<br><br><br><br>(Super. Ct. No. SCS321078) |


APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Anastasia Sagorsky, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted William Ray Chism II of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1); count 1), and making a criminal threat (§ 422; count 2). As to count 2, it found true allegations that Chism personally used a deadly and dangerous weapon. (§§ 1192.7, subd. (c)(23), 12022, subd. (b)(1).)

In bifurcated proceedings, Chism admitted he suffered prior strike convictions within the meaning of the "Three Strikes" law. The court sentenced Chism to 25 years to life on count 1 and stayed the count 2 sentence under section 654.

Chism's sole contention is that the court violated his constitutional rights to counsel and to remain silent by admitting into evidence certain statements he made during and after the incident because he was not given warnings required by *Miranda v. Arizona* (1966) 384 U.S. 436, 479 (*Miranda*). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

A.P. testified that in January 2022, he drove to a store in Santee, California and, upon leaving his car, Chism approached him and screamed, "You can't park here! Move your fucking car!" A.P. did not heed Chism, who then threatened to "blow up" A.P.'s car, slice his vehicle's tires, and "bash the windshields." Chism told A.P., "I'm going to fucking kill you. I'm going to cut your fucking throat off. I'm going to fuck you up." Chism pulled out a boxcutter and again threatened to kill A.P. He "lung[ed]" at A.P. with the boxcutter and "swiped" at him with the exposed blade. A.P. dodged and therefore avoided getting cut. A.P. believed Chism tried to kill him. A.P. called 911 and grabbed a bat from his car. Chism ran away.

---

[1] Undesignated statutory references are to the Penal Code.

2

San Diego County sheriff's deputies arrived on the scene and met with A.P., who recounted the incident consistent with the testimony set forth above.

At the scene, a deputy contacted Chism in the area behind the store, patted him down for weapons, and handcuffed him either before or after the pat down.  A.P. identified Chism at the scene.  Chism said he was going to start killing people, and threatened physical violence towards A.P.  The deputy described Chism as being "upset," "serious" and "angry."  The deputies found no boxcutter on Chism, and stopped searching for it because the area behind the store was approximately the size of a football field and covered with high brush.

While Chism was detained, but before he was arrested, he spoke with a deputy about different matters.  The prosecutor redacted Chism's racial slurs when the recording was played for the jury:

"[Chism:]  So do your fucking job.

"[Deputy:]  I am doing my job.  Just—

"[Chism:]  No sleeping in parking lot like Walmart and Home Depot.  Enforce the laws.

"[Deputy:]  All right, look—

"[Chism:]  Instead of playing games—

"[Deputy:]  I'm trying to do this at the lowest level, right?  [A.P. is] saying that, you're saying this.  Look, we'll just make sure we'll go our separate ways.

"[Chism:]  He's got a baseball bat in the trunk of his car.

"[Deputy:]  Okay, well, we'll go our own separate ways, okay?  After the, we'll, we'll just hold on.  My friend—

"[Chism:] [Racial slur used to refer to A.P] better get out of fucking Santee. I'm on the hunt. I'm on a death run. . . . I ain't playing no more. I'm looking for death. Everybody knows it. I'm gonna start killing people."

At another point, Chism continued his diatribe along the same lines:

"[Chism:] It's against the law to sleep outside. They're everywhere.

"[Deputy:] All we'll talk to him about that—

"[Chism:] So cut the bullshit.

"[Deputy:] We're gonna talk to him. We're, my partners are talking.

"[Chism:] Fuck that [racial slur]. The only talking is gonna be me and my fist through his fucking neck."

Chism told the deputy, "Look, I respect you guys. I'm a Hell's Angel-bred, peckerwood-branded Aryan brother. I don't fuck with the government, you guys do your job."

At another point, Chism stated, "I want a prosecutor." The deputy replied, "Okay. Even if you prosecute [A.P.] though, he's not gonna jail [*sic*]. You know that, right?" Chism twice replied, "Good. I'll kill him."

The deputy later asked Chism, "You okay? You wanna go there to the sun, dude?" Chism replied, "No, I don't. I wanna kill that dude. You guys don't want, you guys wanna disrespect me. Listen, you wanna disrespect me?" The deputy denied he was disrespecting Chism.

When the deputies attempted to place Chism in a law enforcement vehicle, he threatened, "You're dead." He added, I already told you on the record, when I get home, I'm gonna kill the sheriff's department. It's on the record."

Once Chism was in the vehicle, a deputy told him they were arresting him for assault with a deadly weapon. Chism said, "No." When the deputy attempted to administer *Miranda* warnings, Chism responded, "Just end it.

4

Why isn't [A.P.] in jail?" The deputy again stated he would administer the warnings. Chism replied, "No. Fuck You." The deputy clarified, "You don't want me to read you your rights?" Chism reiterated, "Fuck you," adding, "You got a green light. That means you're done." A deputy testified that when Chism referred to them as being "green lit," it meant that "when the opportunity arises, you will be murdered." The deputy did not read Chism his *Miranda* rights at that time.

*The Investigation*

Investigators obtained either audio or video of the following matters that it presented to the jury at trial: the store's surveillance video of the incident, A.P.'s 911 call, and a deputy's body worn camera footage of his initial interviews at the scene with A.P. and Chism.

*Defense Evidence*

Chism testified he thought he had previously seen A.P. sleeping in a store's parking lot, so he confronted him about it as A.P. exited his vehicle: "[When A.P. is] close to me, I said, 'Hey, who the hell are you, or what are you doing parking in parking lots illegally?' And I think I called him a piece of shit." Chism denied having a weapon. He also denied speaking to A.P. in an angry tone or raised voice, instead claiming his vocal cords were damaged.

Chism testified regarding his initial encounter with the deputies at the scene: "And so they patted me down and did all that . . . and then they said, 'What happened, Chism?' And I wasn't cuffed up yet. I said—I told them what happened, . . . and then [a deputy] said, 'Do me a favor, Chism. I'm gonna cuff you up until we find out what happened.' I said okay. . . . So I guess I probably talked to [a deputy] for about 12 to 15 minutes." Chism denied saying "Fuck you," when a deputy tried to read him the *Miranda*

5

warnings; rather, he testified he sarcastically said, "I can't hear you, and I don't understand English."

The prosecutor on cross-examination asked Chism about the incident and Chism explained his actions in this colloquy:

"[Chism:] . . . This town's been infested by homeless people for the last 12 years, and, you know, there's not enough people to—not enough deputy sheriffs to—even though it's illegal to sleep outside, the government doesn't enforce the laws of the state of California.

"[Prosecutor:] So you believe it's your job?

"[Chism:] I believe in community service. My job's just to—I work hard for a living. . . .

"[Prosecutor:] You would call taking a boxcutter and swiping it at somebody and threatening to slit their throat community service?

"[Chism:] Number one, ma'am, I didn't have a boxcutter, and I never threatened to slit his throat. In that video I said I'd punch him in his throat, not slit his throat, ma'am."

DISCUSSION

Chism contends that "as of the time of contact, police were familiar with [him, as he] had just run from the scene of the incident. As a result, police clearly had probable cause to arrest [him] . . . . Stated another way, [he], at the time of police contact, had already been 'substantially implicated' in the offense for which he was ultimately arrested, and any later 'investigation' would have merely confirmed that fact, and so would not constitute a 'general inquiry into an unsolved crime.' [Citation.] Moreover, it is evident that he, who had prior experiences with police and contended that he was being prosecuted vindictively, would not have reasonably believed that he was free to leave."

6

The People counter that "[Chism] was not in custody. While he was detained and in handcuffs, and a reasonable person would not have felt free to leave, based on the totality of the circumstances and weighing all the factors, [he] was not in custody. As such, his *Miranda* rights were not implicated, and the statements were properly admitted."

## I. *Background*

Chism represented himself at trial and moved in limine to exclude from evidence his statements to the deputies, "You're dead," and, "The Santee sheriffs are dead." At the motion hearing, Chism added: "[T]he defense is requesting [A.P.'s] statements concerning 'I'll cut your throat and kill you' not be allowed."[2]

The prosecutor countered that Chism's threats towards the deputies corroborated his state of mind and intent at the time of the incident and was relevant to his charged criminal threat to A.P. The prosecutor summarized the transcripts of the deputies' videos and provided this context: "[Chism] was immediately cuffed upon contact. They do explain it's for officer safety. They do have prior interactions with him. At that point he—they are very clearly still investigating the crime. They are actively taking statements from both parties. They tell him, you know, 'As soon as we figure out what's going on, we're going to take off the cuffs.' They talked to him about just walking away after this is all over. [¶] [Chism] makes a variety of spontaneous statements about what happened. There is a point where one of the deputies comes and tries to take his side of the story . . . then walks over and speaks to [A.P.], and there's back-and-forth in deciding whether this is a

---

[2] The People mistakenly contend that Chism failed to argue below that his statements related to his threats to slit A.P.'s throat should also be excluded from evidence.

chargeable crime, an arrestable crime."  The prosecutor further pointed out that when deputies decided to arrest Chism and attempted to read him his rights, he replied, "Fuck you."

The court admitted into evidence all of the challenged statements, finding "there's no violation of your *Miranda* rights, number one.  And number two, that spontaneous statement comes in because it shows your state of mind again, which—threatening and angry and corroborates the state of mind that you had when you confronted [A.P.]"

## II. *Applicable Law*

"The Fifth Amendment of the United States Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.' " (*Colorado v. Spring* (1987) 479 U.S. 564, 572.)  *Miranda* held that statements resulting from custodial interrogation are inadmissible if a suspect has not received warnings of his rights to remain silent and to consult with an attorney.  (See *Miranda, supra*, 384 U.S. at p. 444.)  The Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action."  (*Ibid*.)  *Miranda* advisements are required when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*California v. Beheler* (1983) 463 U.S. 1121, 1125.)  But "*Miranda* warnings are not required 'simply . . . because the questioned person is one whom the police suspect.' " (*Beheler,* at p. 1125.)  " 'Absent "custodial interrogation," *Miranda* simply does not come into play.' " (*People v. Clair* (1992) 2 Cal.4th 629, 679.)  "[T]he term 'custody' generally does not include 'a temporary detention for investigation' where an officer detains a person to ask a moderate number of questions to determine

8

his identity and to try to obtain information confirming or dispelling the officer's suspicions." (*People v. Farnam* (2002) 28 Cal.4th 107, 180.)

In determining whether a person was in custody, factors to consider in the totality of the circumstances include "(1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning." (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1753 (*Forster*).) Additional factors include whether the officer informed the detained person that he or she was considered a suspect or a witness, whether the subject's freedom of movement was restrained, whether police informed the person that he or she was in custody or under arrest, whether officers were aggressive, accusatory, and/or confrontational, whether police expressed the belief that the person was guilty and that they had proof of that fact, whether police pressured the suspect with interrogation tactics, and whether police arrested the subject after the interrogation. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.) No one factor is controlling. (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1404.) "Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera,* at p. 1162.)

For purposes of *Miranda,* " 'interrogation' " means "express questioning" or "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fn. omitted.)

"In reviewing *Miranda* claims, we 'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.' [Citations.] We review *Miranda* claims under federal constitutional standards." (*People v. Johnson* (2022) 12 Cal.5th 544, 578.) The harmless-error test under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) applies to erroneous admission of statements obtained in violation of *Miranda* and involuntary statements. (See *People v. Moore* (2011) 51 Cal.4th 1104, 1129.) An appellate court "has the power to review the record de novo in order to determine an error's harmlessness. [Citations.] In so doing, it must be determined whether the State has met its burden of demonstrating that the admission of the confession . . . did not contribute to" the fact finder's decision against the defendant. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 295–296; see also *Neder v. United States* (1999) 527 U.S. 1, 18 ["Is it clear beyond a reasonable doubt that a rational [fact finder] would have [reached the same result] absent the error?"].)

### III. *Analysis*

We need not decide whether Chism was in custody for *Miranda* purposes because even assuming arguendo that he was, we would still conclude he was not subjected to interrogation while in custody.

Chism does not cite evidence showing that the deputies interrogated him, and we see no indication that they did. Specifically, nothing the deputies asked or told Chism provoked him to issue the threats that he sought to exclude from trial. As set forth above, the transcripts of his interactions with the deputies show that he made numerous unprompted

10

threats. "The Fifth Amendment does not bar the admission of '[v]olunteered statements of any kind' (*Miranda, supra*, 384 U.S. at p. 478), nor those otherwise not resulting from interrogation." (*People v. Cooper* (2019) 37 Cal.App.5th 642, 650, citing *Rhode Island v. Innis, supra*, 446 U.S. at pp. 299–300.) Therefore, the trial court did not err by admitting Chism's statements.

Chism argues that under *Chapman, supra*, 386 U.S. 18, the court's error in admitting his statements was not harmless as he and A.P. provided contrasting testimony; "both parties were armed with weapons"; the deputies never recovered any boxcutter; and his statements to police were inflammatory as he used profanities and racial slurs, claimed "to be a member of Hells Angels and Aryan Brothers gangs, and . . . threat[ened] to 'green light' or kill one or more [deputies]." He contends that if he had received *Miranda* warnings, "there is every possibility [he] would have been more circumspect, and therefore avoided or minimized his criminal liability."

We conclude that any error in admitting the challenged statements was harmless beyond a reasonable doubt under *Chapman, supra,* 386 U.S. 18. A.P.'s testimony regarding the incident was consistent with the surveillance video, his 911 call, and A.P.'s first interview with the deputy at the scene, and Chism does not challenge their admission into evidence. Chism's belligerent demeanor continued even minutes later when the deputies arrived. Further, the jury was instructed with CALCRIM No. 301 that the testimony of only one witness can prove any fact. The threats Chism made directly to A.P. were independently admissible into evidence through A.P.'s own testimony.

Moreover, as the jury observed Chism testify and assessed his demeanor, it could have reasonably concluded he lacked credibility, as his

11

testimony conflicted with his statements and actions as recorded by the deputies' body-worn cameras.  Chism's own testimony that he did not threaten to slit A.P.'s throat, but rather to "punch him in his throat" still was incriminating, and provided an adequate basis for the jury to convict him of making a criminal threat.  The fact the deputies did not find a boxcutter is not dispositive because, based on one deputy's testimony, the area behind the store was sufficiently large and filled with high brush that Chism could have disposed of the boxcutter there.

Finally, we are not bound by Chism's speculation that if the deputy had advised him of his *Miranda* rights, he might have been more circumspect and avoided or minimized his criminal liability.  As Chism stated on video during his detention, he has had many encounters with law enforcement officers; yet those prior experiences did not prevent him from spontaneously making statements that harmed him in this case.

DISPOSITION

The judgment is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

IRION, J.

CASTILLO, J.

12